and Sheriff of Jacksonville, Duval County, Florida. Thank you, and may it please the Court. Jason Hilborn for the Governor of Florida. On both standing and the merits, the dispositive question in this case is whether Florida's anti-riot statute criminalizes peaceful protests. It does not, first and foremost, because of Subsection 7. Subsection 7 states that the statute, quote, does not prohibit constitutionally protected activity such as a peaceful protest. That is an express indication of the legislature's intent not to have the statute criminalize peaceful protest. And the First Circuit addressed a very similar provision in the Bloom v. Holder case that we cite in our reply brief. And the First Circuit explained that a provision such like this precludes interpreting the rest of the statute to criminalize peaceful protest. And I would ask this Court to do the same. Now, the plaintiffs try to wave this away as a mere savings clause, but it's not a mere savings clause, because although it does ask this Court and courts to interpret it constitutionally, it goes beyond that to exclude specific activity of the accused that is not covered by statute. But even if it were a mere savings clause, even plaintiffs' own cases and the cases cited by the district court, like the Sisbis case, support the proposition that even a mere savings clause should be used to validate the constitutional interpretation of the statute. So as we move into Subsection 2, to the extent any interpretive questions arise there, those questions should not and cannot be resolved in such a way to criminalize peaceful protest, because we know from Subsection 7 that the statute does not do that. But moving to Subsection 2, right away, we have a willfully requirement. Let me ask you a question about the so-called savings clause. How can the savings clause resolve ambiguities in the definition? I mean, if there's a... It seems to me that your argument assumes that there's a clear line between what would be a violent public disturbance. Can you help me with that? Sure. So I think that's... Well, I think they are a bit binary. You're either... The plaintiffs say that they want to engage in a nonviolent demonstration, which is how I would define peaceful protest. And so we have a violent public disturbance contrasted against a nonviolent demonstration. Well, the plaintiffs say that when they look at the definition, it's not clear, and I think they may be right, that if they're peacefully protesting at a place where a violent disturbance breaks out, they may be able to be prosecuted or at least arrested under this statute. So I think that is definitely not the case, Your Honor, and I think we can gather that from Subsection 2. So again, there's the willfully requirement right away, and I think even the plaintiffs agree that that means knowingly and intentionally. And then just putting participate to the side for a second. The opening clause talks about what the disturbance is. It needs to be violent, which is, of course, important here. It needs to be public, which is easy to skip over, but it is important here because one of the plaintiff's fears is enforcement of the statute against them in their own backyard. So that's off the table right away. And it needs to involve at least three people. So violent, public, and involve three people. Only two is not going to be enough. Now, of course, we have the actus reus of the statute participate. Participate means to be active, and it derives its meaning in large part from its object. Here, a violent public disturbance. And so the statute requires the accused to be active in a violent public disturbance and to do so willfully. You cannot be active in a violent public disturbance or a violent thing without being active in violence. And the statute continues on to require the accused to have an intent to assist in violence. I think you may be asking for the verb participate to do too much work. It doesn't seem to me that's a very strong verb. In some sense, our audience here is participating in oral argument, and they're willfully participating because they voluntarily showed up here. So I'm not sure it can carry the weight that you're trying to put in it. So I think I would disagree that the audience behind me is participating because they're not being active in this argument. And we know that participate sets a very high bar for at least a couple of reasons. So in subsection 4 of this same statute, the legislature felt the need to spell out what it takes to incite a riot. So the legislature apparently did not believe that even inciting a riot rises to the level of participation. So we have participate, incite, and maybe even below that something like aiding, but participate sets a high bar. And another reason we know that participate sets a high bar is because the federal statute, the federal anti-riot statute, which is at 18 U.S.C. 2101 to 2102, has used the verb participate since 1968 apparently successfully, and the plaintiffs do not take any issue with that statute. And I think on its face that statute is much broader than ours. And so participate sets a high bar. And again, so moving through the statute, though, we have the modifying trait. Can I hold on participates for a second? And I think just to sort of piggyback on what Judge Pryor is asking is that certain lines get blurry, and when you have to determine who is participating, how do you determine who is participating? Because what if you do have a peaceful protest, not even near another protest? It's in a very discreet city block, and it's a peaceful protest, and there are 20 people that are participating in the peaceful protest, and 10 all of a sudden start acting out violently. Because you're participating in the protest where violence has broken out, I think that's where it becomes hard to determine who is actually participating. In that hypothetical, Your Honor, only the people who are engaging and actively engaged in the violent part of that crowd would be participating in a violent public disturbance. And the statute provides even further protection for peaceful protesters, though, because to get into the modifying phrase, and there's been a lot of dispute over what that phrase applies to, and I'm referring to the acting with a common intent phrase, that modifies the intent that the accused must have for at least two reasons. First, this is a criminal statute focused on an individual and what the individual must do to have committed the crime of rioting. It would be quite odd for the Florida legislature to have drafted this new riot statute and explicitly insert an intent requirement that would apply exclusively to individuals not even accused under the statute, and in fact specifically exclude the accused. So that's not a reasonable reading in the first instance, but we know that that was not the legislature's intent because of the punctuation that the legislature chose to use. Here, a comma. Whenever you have a comma before a modifying phrase, like we have here, that indicates the drafter's intent to have that phrase apply beyond simply the words that come immediately. Counsel, you've covered that pretty completely in your brief. One thing you haven't covered is, I've read your, and have it detailed, the position you've taken throughout this litigation on the relationship between the common law definition of riot, which everybody seems to concede is constitutionally permissible, and the new statute. And I still don't understand it. One problem I have is you've gone from pillar to post on it and back to pillar again. What conduct, you can give me a hypothetical if you want to, does the amendment of the definition cover that was not covered and is not covered by the common law definition? Well, I think in the first, so what conduct would certainly be willful conduct? So knowing an intention. No, no, no. Give me a real world example. Tell me about Joe Protester and what would be covered under the common law definition but isn't under the statute or is covered by the statute, but it wasn't under the common law definition. I think our statute narrows the common law definition by adding a willful requirement. Okay, fine, fine. Give me an example. Someone who says, thank goodness for the legislature passing what the governor said was the toughest and most pro-law enforcement statute in the country because otherwise I would have been guilty of a riot. But now, thank goodness for the governor and the legislature, I'm not guilty of it. Give me an example of that protester. It's not clear to me that under the common law definition, which I think is more vague and more overbought than our new statute, that a person could not be caught up in a riot, much like the plaintiffs fear. So I think that would be an example. But I want to make one point about the common law definition. It does not actually have an actus reus requirement, and I think that's been somewhat overlooked in the papers here. So if someone was there peacefully protesting and had no intent to join the riot, you're telling me under the common law definition he'd be guilty of rioting? I do not mean to say that, Your Honor. I'm saying that the new statute introduces an explicit mens rea requirement of willfully that inherently narrows what the common law definition says. It seemed to me like Beazley covered that and said there had to be an intent. I think that's right. The court read an intent requirement into the statute, but here we have an express indication which provides even more help to an ordinary person on the street. So if the Supreme Court of Florida says you have to have intent, that means in Florida you have to have intent, doesn't it? So the statute changed nothing. Counsel, doesn't the fact that you're having a problem telling me what the statute does that the common law definition that it amends didn't do indicate to you that there's a problem with your theory? I don't think so, Your Honor. Again, the common law definition doesn't even have an actus reus requirement. So here in the new statute, it requires participation. The old common law and statutory regime simply said that all persons guilty of a riot have committed a certain felony. And so the legislature had to turn that into a full statute. But the Florida Supreme Court changed that into a full definition of what it means to participate in a riot, which served for 46 years, or 45, I guess. If you think of anything while you're sitting there, I'd appreciate you letting us know what real-world difference under your theory of interpreting the statute does this strongest, most pro-law enforcement statute make. Yes, Your Honor. Counsel, I have another question. If we were to agree with one of the arguments you've made, that this should be certified to the Florida Supreme Court, you have also indicated that as far as we still have a preliminary injunction out there that we should reverse the injunction. What's your best argument for why we shouldn't leave the injunction in place? I think certification, the reason for certification in the first place, is based on federalism and principles of comity with the states. And here we have a state law that has been enjoined. And so I think if we're certifying based on comity with the states, it would be somewhat contradictory to then leave an injunction in place of a duly enacted state law, especially when the standard we need to show for this law is not actually that stringent, as plaintiffs say. The reasonable and readily apparent standard is discussed in the Cheshire case we cited in our reply brief and I think provides good color on that. What's your best case for why we should deal with the injunction as you would propose? I think an injunction, as Chief Justice Roberts said in the Marilyn B. King case, that an injunction of a state law is inherently irreparable harm. And so we are being irreparably harmed as our law is enjoined. And I think for the reasons we lay out in our brief, that we've shown enough to have that injunction reversed entirely without even a need for certification. But if the statute is vague and overbroad and therefore unconstitutional, then you would agree that the state doesn't have an interest in enforcing it, right? If it is, yes. Right, and so the whole purpose of certification would be for the Florida Supreme Court to have an opportunity to construe the statute in a way that it would not then be vague and overbroad, right? Correct, that would be a purpose of certification, yes. And the reason for leaving the injunction in place would be just to give the court time to make that determination. Well, again, I think for the reasons we lay out in our brief, that there's no need for the injunction to stay in place. We've shown that it should be reversed. And so, again, if we're talking about kind of the default rules here, I think the default should be that the state law has been duly enacted in which the plaintiffs have not shown a likelihood of success on the merits of that constitutional question, that injunction should not be maintained. That's a fine argument if you ignore the fact that you haven't been able to tell us in real-world terms what difference the statutory definition makes. So the state will still be able to. Judge Walker said at least twice, maybe three times, that the state common law definition of right was constitutionally permissible and he was not enjoining it. So you've still got that. And unless you can make some showing, which I haven't heard yet, specificity that is going to prevent you from doing something, a state policy that's different from the common law definition, I don't see how that's irreparable injury. Well, I think if that's the case, Your Honor, then I'm not sure how the plaintiffs have established traceability and redressability. And I know that the plaintiffs and the district court below focus a lot on the many tools at the state's disposal here. Well, the counsel, the reason they've established it is they've alleged that what the statute means is something different from the common law. You're the one who keeps telling us, don't worry, it's the same as common law. That's what you started out with in your position in this litigation. And then you shifted to, it's even better. We're just protecting these folks who go to these peaceful protests that turn into riots, but we don't ever really hear exactly how they're doing it. I'm not going to take up any more of your time, or I guess it's the court's time now, arguing. I'm just troubled by the fact that I really don't understand your interpretation of the statute. Understood, Your Honor. All right, you were answering the court's questions, Mr. Hilburn, so we're going to give you your two minutes for rebuttal that you've reserved. Thank you. And we'll now hear from Ms. Harrell. May it please the Court. Sonya Harrell for Sheriff Mike Williams of Jacksonville. We agree with most of what the governor's office has said about this statute. To answer Judge Karn's question, I had the luxury of sitting at the table while my co-counsel was on the hot seat The common law definition, if you plugged in the Beasley definition to the previous riot statute, it would read, all persons guilty of a tumultuous disturbance of the peace by three or more persons assembled in acting with a common intent, to the terror of the people, all that. What we have now, Your Honor, is a belt and suspenders for the intent requirement. We have that the group has to share a common intent to assist each other in violent and disorderly conduct. And we also have to have the individual subject to prosecution engaging in willful participation, not innocent bystanding, not peaceful protest, not just holding up a sign while there's a riotous melee going on around them. Your Honor, you asked about a real-world example, and I think a good example would be the concern of the Appalese about outside agitators coming into their peaceful protests. The North Side Coalition gave an example of when they're protesting, there's a white supremacist agitator who comes in and they're scared that he could cause violence. The new statute provides additional protection for the peaceful protesters if an outside agitator comes in, because if three or more outside agitators come in and start engaging in a violent public disturbance and the peaceful protesters somehow get caught up in that, they lack the willfulness element of the first part of the statute, and they also lack the common intent with that assembly of the three or more outside agitators. So while the original statute was enforceable and somewhat sufficient, the amendment builds on the common law. It does not broaden the class of people who may be prosecuted. It instead assists law enforcement and prosecutors with determining who is willfully participating in violent public disturbance. So your position is that this isn't the broadest statute, it's not the strongest anti-riot statute. In fact, it weakened the existing Florida law prohibiting riots, and it did so out of concern for peaceful protesters. Your Honor, I believe that the governor was speaking, I don't want to put words in his mouth, but I believe he was talking about House Bill 1 as a whole, which contained a lot of other budgetary issues. I understand, and somebody in the legislature just snuck in this provision that weakened existing anti-riot law in a key respect by defining what a riot was, and they did it in the interest of and on behalf of peaceful protesters, and all these plaintiff's groups and amicus or amicus who are supporting them just failed to realize that. Plain as day, they should know that this is just helping them out. Is that your position? No, Your Honor. I don't really, I can't get into the minds of the legislature and what they were thinking when they were enacting this. All I can go on is the plain language of the statute, which says it requires willful participation. There's nothing in the plain language about innocent bystanders getting caught up in excess violence. There is something about peaceful protest, and so I think if the legislature had intended to rain bricks on, I think was the term that was used, if they had intended to rain bricks on peaceful protesters, they would not have also included Section 7, which specifies that this is not designed to affect peaceful protesters. I see that my time is nearing. I would just reassert that the plain language of the statute is consistent with longstanding criminal law in Florida that says that mere presence at a crime is not sufficient to convict of the crime, and we'd ask that this court reverse the preliminary injunction. Thank you. Thank you. Mr. Tice, is that how you pronounce your name? Tice. Yes, that's correct. Thank you, Your Honor. May it please the court, James Tice on behalf of the Plaintiff Community Organizations. I want to go right to the key term I think we've been discussing today, which is the word participate, and I think it's important to look at the context here. In response to unprecedented police accountability protests, Florida expanded the scope of its riot offense facially by tacking essentially 17 new words onto the common law definition. And so now on its face, the amended definition now covers not only the violent rioters themselves, the common law rioters assembly, but anyone who, quote, participates in a larger assembly of which those rioters form a part. And I think it's important, and this goes to several of the questions I think Judge Branch asked and Judge Pryor as well, in the context of a protest, to participate is to be at the protest. It might be carrying a sign. It might be marching. It might just be being there. If I said I participated in a protest over the weekend, it means I attended it. So my clients rightfully have looked at this vague language, this vague and new language, and have found that it has absolutely chilled the exercise of their First Amendment rights, which is an irreparable harm per se. It fails to give ordinary people fair notice of the conduct it prohibits. And I think perhaps even more insidiously, it encourages arbitrary and discriminatory enforcement in that plaintiff's members are now subject to arrest and mandatory custody. Mandatory custody if a police officer determines that they participated in a larger assembly of which that common law riot forms a part. Can I ask you a quick question, just sort of backing up a little bit about this lawsuit, when it got started. There are a lot more sheriffs in Florida than you have sued. So how is this lawsuit going to go? What about the other sheriffs? Well, Your Honor, there's no requirement in Article 3 for showing redressability that we would redress all harm we would possibly face. I think it would redress the harm we face from these particular defendants. And the reason why these sheriffs were chosen, there was actually three sheriffs in the case, two of them chose not to appeal, but of those three sheriffs and the governor is these were the ones, the sheriffs who were in the vicinity or, you know, oversaw the areas where my clients operate primarily. So, for example, Northside Coalition of Jacksonville is Sheriff Williams's jurisdiction. And the same is true of other organizations. And so I don't think that's a problem for redressability. I think it's clearly would redress our harms with respect to these particular defendants. I'd also like to... Let me ask you something because the more I think about this case, the more appealing certification to the Florida Supreme Court is. Say you won this argument and you get a decision from us affirming the permanent injunction, if you want to, for purpose of my question, what's to keep a Florida prosecutor, a Florida grand jury, any of the hundreds of state trial court judges from disagreeing with our decision and allowing the prosecution of protesters that we say shouldn't be prosecuted. You know that our decision doesn't bind any of the hundreds, hundreds of Florida state trial judges, much less the five DCAs, much less the Florida Supreme Court. But yet if you certify a question to the Florida Supreme Court about what does this mean, not whether it's constitutionally permissible or not, but what does it mean? Does it expand the common law definition of riot or not? And if so, how? That gives you ultimately more protection or determines that you don't need the protection because you've already got it under the existing common law definition. So why isn't that the proper route? Well, Your Honor, I think that, you know, if you look at the plain text of the statute, I think if you apply the normal Kansas statutory construction, our reading I think is undoubtedly better. I don't. I don't. Well, better doesn't tell us what's the correct one. And one thing we all know, the baseline we start with is whatever the Florida Supreme Court says this statute means is what this statute means. Right. And neither of the district court judge, this court or the Supreme Court of the United States can overturn the state law meaning of those terms. Once the Florida Supreme Court pronounces. Absolutely, Your Honor. And I didn't mean to disagree with that at all. I agree with you that this court actually lacks power to authoritatively construe state law. Of course, I do think that a affirmance in this case would send a strong message to all of those state attorneys. You're talking about all the prosecutors and, and obviously, you know, a statement saying that this is not even a reasonable reading that the governor's putting forth would send a strong message. Having said all that, you know, if there's any doubt about that question at all, then certification, yes, we would agree with both Florida and the United States would be a viable alternative option for the reasons you mentioned. It would allow the Florida Supreme Court to adopt a binding and authoritative interpretation that would bind all Florida law enforcement. It would protect our clients in that manner as well. We don't think it's necessary to do so in this case. We think an affirmance is appropriate considering the, the statutory construction issues that we've already discussed. That was the path in Stenberg v. Carhartt. The court said because there's no reasonable and readily available construction, we can affirm. But again, for the reasons you mentioned, it's an unsettled question of state law that the Florida Supreme Court could, could adjudicate once and for all. That's a different position than I read in your briefs. And in the footnote where you were discussing it, that's helpful to me for that reason. So we've basically got two defendants and you all agreeing that if you're going to lose otherwise, please certify. That's right, Your Honor. And that's, that's often what we hear. And it's not a convincing position, but what it tells me is that you all three recognize there is at least some contingent wisdom in certifying. That's right, Your Honor. I mean, I, again, I don't think it's inconsistent with the position we took in our footnote. I think I continue to stand here today and say the proper course is to affirm the injunction. Judge Walker's opinion is thorough. It's absolutely correct. It's based on extensive factual findings. There's no reason why this court can't simply affirm. That would, again, allow us to go to final judgment in this case on this claim and our other claims. And it would, you know, continue to protect our clients who are otherwise being injured in their exercise of their First Amendment rights. But, again, to the extent there's any doubt about that, then we would agree with the alternative positions of, I think, all other parties in this case and the United States. I will say that if that is the result, then it's absolutely the case that the injunction should be maintained pending that certification procedure. I think the United States, or excuse me, the governor has acknowledged that they have no authority for the proposition that the injunction should be lifted. On the contrary, it is the standard practice that injunctions remain in place pending certification. And, in fact, I think it would be extraordinary in the circumstance where the governor cannot articulate any particular harm because they are saying today that essentially codifies the common law definition. They can't point to anybody else who would be treated differently. It would be extraordinary to lift the harm, re-expose my clients to the First Amendment irreparable per se harms we've been discussing while we're asking the Florida Supreme Court whether or not the statute actually will cause those very injuries. I think we defy common sense and typical practice in this circuit. On that point, though, I would like to talk briefly about the conduct point. I think, Judge Carnes, you're exactly right that it's essentially the same conduct under their interpretation. Our interpretation actually gives meaning to the new words about willfully participating in a violent public disturbance that involves a common law riotous assembly. Theirs does not. Under their reading, Florida amended its law in 2020 in response to racial justice and police accountability protests for no reason. They didn't have to do that at all. I would also emphasize that the common law did have an intent requirement under the Beasley definition. It says acting with common intent. That is a mens rea. They certainly did not need to do it to add new words that were vague and, in fact, redundant. Under their definition, there's two different mens rea for the same actor. There's willfully and also acting with common intent. There's two different references to violent. There's a violent public disturbance and violent and disorderly conduct. You have to assume that the language about, you know, involving a violent public disturbance involving an assembly of three more people is just pure surplusage. It could be cut. I don't think they dispute that in their reply brief. And so, again, I think it goes to show why there's no harm from the injunction here, and it's presumably why two of the four defendants in this case did not appeal. Unless the Court has other questions, the final point I would make is just to refer to the Section 7 point that my friend on the other side mentions. And I think the key word that he said was binary. It's either a peaceful protest or it's not. We think that's the exact problem with this, and that's the inherent vagueness here. It says this statute is not supposed to apply to a peaceful protest, but the context of the statute is it's defining the meaning of riot to encompass more activity and thereby lessen what it means to be involved in a peaceful protest. So to say it does not involve a peaceful protest, in our view, just begs the ultimate question in this case, and it really gets to the heart of the vagueness and the chill problems associated with the statute. My friend on the other side mentioned the Blum case as well. It's a First Circuit case. It came out immediately post-Clapper, and it really relied on Clapper's analysis. And it involved a federal statute, so it also emphasized the language from Clapper about how we impose a specially high standing bar in situations where one branch of government would have to opine on the constitutionality of the actions of another branch of government. So we think it's distinguishable in that circumstance. But I think more broadly, it ignored the fact that Clapper was about a situation where the enforcement activities were not being assigned to the accused in that case. The plaintiffs in that case were saying other people were going to be investigated and were having to take measures to avoid being investigated. And the Supreme Court made clear in Clapper that the fact that they were not the entity that was actually potentially being prosecuted or investigated, it said in a First Amendment context, we've never said that that was sufficient. I think a few months after Blum and Clapper, the Supreme Court issued the Susan B. Anthony v. Driehaus case, which made clear that in the First Amendment pre-enforcement context, it has to be the case that the traditional test of whether there's credible threat of prosecution and substantial risk of prosecution is enough. And there should be no dispute about that. The language obviously arguably prescribes the conduct at issue. If there are no further questions, I'm happy to reserve the balance of my time. Thank you. Thank you very much. Mr. Hilborne, rebuttal. Thank you, Your Honor. If I could please go back to Judge Karn's questions about the common law. The first main difference, again, is the willful participation requirement. That is not in the common law. The common law also made criminal merely encouraging a riot. That is not in this statute. I would also direct the Court to subsection 3B, in which this statute provides extra protection for those not participating in the riot because it is essentially an aggravator provision that if you cause great bodily harm to someone not participating, you're subject to even greater punishment. And then, of course, we have subsection 7 as well. But I do want to note that the question here really is not whether the new statute, really what the relation between the new statute is and the common law at all. The question is whether on the face of this statute, if it is overbroad and vague and particularly if the plaintiffs face a credible threat of enforcement of it against them for peacefully protesting. And the plaintiffs mentioned Dry House today rather than Clapper. Dry House does not help them. Dry House, if this Court looks to Part 4C of Dry House, the facts in Dry House are opposite here. In Dry House, the plaintiffs point to actual application of the statute against them. The plaintiffs do not do that here. The plaintiffs here do not even point to application of the statute against other peaceful protesters at all, like they were able to do in the Steffel case, which is discussed in Dry House as well. And in Dry House, the defendants did not disavow an interpretation of the statute to cover the conduct the plaintiffs wish to engage in. Here, of course, the defendants have. Now, on the certification point, I just want to emphasize that the standard that we have to meet here is not that stringent, as the plaintiffs say. The reasonable and readily apparent standard, which we agree applies. In Cheshire, this Court said it absolutely can adopt a limiting construction of a State statute. It just cannot change the plain text, which is not remarkable. And the Court even went on to explain that even a less grammatical reading of a statute can still be a reasonable and readily apparent reading because the question is not whether using other words would have been preferable. The question is whether using other words were required by the United States Constitution. Thank you, Counsel. We understand your arguments. Thank you. Thank you. Thank you.